ROBERT S. BREWER, JR.
United States Attorney
AARON P. ARNZEN, Cal Bar No. 218272
ANDREW J. GALVIN, Cal Bar No. 261925
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-8384 / 9721
Email: Aaron.Arnzen@usdoj.gov; Andrew.Galvin@usdoj.gov

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW HACKETT (1),<br>ANNETTA BUDHU (2),<br><br>Defendants. | Case No. 18CR3072-BTM<br><br>**UNITED STATES' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTIONS *IN LIMINE* TO:**<br><br>1. **ADMIT CONSPIRATORS' REFERENCES TO OTHER "DEALS" IN DESCRIBING THE CHARGED SCHEME**<br><br>2. **ADMIT EVIDENCE OF DEFENDANT ANDREW HACKETT'S USE OF BOILER ROOMS TO PROMOTE "DEALS" OTHER THAN IN THE CHARGED SCHEME** |
|---|---|

The United States of America, by and through its counsel, Robert S. Brewer, United States Attorney, and Aaron P. Arnzen and Andrew J. Galvin, Assistant U.S. Attorneys, hereby files its supplemental memorandum in support of its motions *in limine* to admit conspirators' references to other "deals" in describing the charged scheme, and to admit evidence of defendant Andrew Hackett's use of boiler rooms to promote "deals" other than in the charged scheme (the "Initial *In Limine* Motions").

## I.
## INTRODUCTION

At the September 25, 2019 *in limine* hearing, the Court directed the United States to specifically identify transcripts and other evidence referenced in its Initial *In Limine* Motions, as well as the related testimony the United States expects to elicit. As the United States argued in its briefing in support of the Initial *In Limine* Motions (Dkt no. 172), this evidence falls into several categories, all of which should be admitted for one or more reasons under the Federal Rules of Evidence and related case law. The transcripts are attached as exhibits hereto, and are organized into categories.

The transcripts that should be admitted because they will provide the jury with knowledge of the time, place, and circumstances of the acts which form the basis of the charge are attached as Exhibits 1-6.

The transcripts that should be admitted because the conspirators referenced other deals to discuss the contours of their agreement with respect to the charged scheme surrounding Arias Intel Corp. (ticker: ASNT) are attached as Exhibits 4 and 6-19. The United States does not believe either of the foregoing categories of evidence are subject to the strictures of FRE 404(b); if the Court disagrees, the evidence is admissible because it easily fits within the limits of admissible "other acts" evidence.

An example of the evidence surrounding Hackett's use of boiler rooms for other stock deals is attached as Exhibit 20. This evidence should be admitted pursuant to FRE 404(b).

## II.
## THE CATEGORIES OF ADMISSIBLE EVIDENCE

### A. Transcripts and Evidence Surrounding the Time, Place, and Circumstances of the ASNT Scheme.

**Exhibit 1** is a transcript of a portion of a consensually recorded telephone call between defendant Vikram Khanna and CHS Michael Forster. During the call, Khanna conveyed to Forster that Khanna has some prior experience with Hackett, including through a deal surrounding a company known as "Yuengling." The United States expects that Forster would testify that he typically wanted and sought to know who else was participating in a deal, and their background, before he committed to a deal; Khanna knew this; Khanna had previously mentioned the Yeungling deal to Forster; and Khanna had possibly invited Forster to participate in the Yeungling deal.

**Exhibit 2** is a transcript of a portion of a consensually recorded telephone call between Khanna and Forster. In this call, Khanna again referred to the Yeungling deal, this time in the same sentence that he confirmed his plans to pursue the ASNT deal. The United States expects that Forster would testify that Khanna was pursuing the ASNT and Yeungling deals simultaneously.

**Exhibit 3** is a transcript of a portion of a consensually recorded telephone call between Khanna and Forster. Like Exhibit 1, Khanna gave to Forster background information about how he knew Hackett, including through a deal involving a company known by its ticker symbol, DAVC. As evident in the transcript, Khanna and Forster discussed the charged ASNT deal before and after the portion of the call about DAVC. The United States expects that Forster would testify, consistently with the above, that he typically wanted and sought to know who else was participating in a deal before he committed to it, and Khanna knew this.

**Exhibit 4** is a transcript of a portion of a consensually recorded telephone call between Khanna and Forster. During the call, Khanna described to Forster his background and experience with Budhu, stating the Budhu has "done shells" for a long

time and keeps "herself safe and secure." The United States expects that Forster would testify that he typically wanted and sought to know who else was participating in a deal before he committed to it, and Khanna knew this. (As discussed below, the two also discussed another deal, QBIO, to convey concepts and plans surrounding ASNT.)

**Exhibit 5** is a transcript of a portion of a consensually recorded telephone call among Budhu, Khanna and Forster. Before Budhu joined the call, Khanna described to Forster how defendant Kuldeep Sidhu knew Hackett. The United States expects that Forster would testify, consistently with the above, that he typically wanted and sought to know who else was participating in a deal before he committed to it and Khanna knew this, and that Sidhu would testify that he had previously participated in deals with Hackett.

**Exhibit 6** is a transcript of a portion of a consensually recorded telephone call among Budhu, Khanna and Forster. Before Budhu joined the call, Khanna shared with Forster background information about, and connections between, Khanna, Budhu, Hackett, and Oliver Lindsay (charged elsewhere), and their overlapping participation in other deals. The United States expects that Forster would testify, consistently with the above, that he typically wanted and sought to know who else was participating in a deal before he committed to it and Khanna knew this; and that "Ollie" is Oliver Lindsay, with whom Forster and Khanna has engaged in other deals. (As discussed below, the group also discussed another deal, QBIO, to convey concepts and plans surrounding ASNT.)

B.      **Transcripts and Evidence Discussing ASNT by Reference to Other Schemes**

**Exhibits 4, and 6 – 11** are transcripts of portions of consensually recorded telephone calls among Forster and Budhu, Khanna, and/or Hackett. During the calls, participants discuss aspects of the ASNT scheme by referring to other stock deals, including deals involving QBIO and QBAK. The United States expects that Forster would testify that he was involved in the QBIO and QBAK deals, both were promoted

on TheMoneyStreet.com, and participants in the deals were highly successful at pumping the price of the stocks and generated substantial profits from doing so.

**Exhibit 12** is a transcript of a portion of a consensually recorded telephone call between Hackett and Forster. The two discussed email and internet promotion tools to pump ASNT stock and how effective these tools are, including how much money they recently have made through the use of these tools on other deals. The United States expects that Forster would testify that he has used email and internet promotion tools in connection with other deals.

**Exhibits 13 - 18** are transcripts of portions of consensually recorded telephone calls between Hackett and Forster. During the calls, Hackett and Forster talked about the contours of an undercover agent's broker network that could be used to dump, or possibly dump, Hackett's ASNT. Forster and Hackett discussed the broker network, and how it worked, in connection with ASNT and at least two other deals, DAVC and WRIT. Exhibit 16 also contains discussion of an email and internet promotion tool that Hackett used to pump ASNT, the fact that Hackett had prepaid for a promotional email campaign and offered these services to Forster, if desired. The United States expects that Forster would explain to the jury the meaning of the terminology used in these calls and testify about his experience with the individuals who offered this particular email and internet promotional tool.

**Exhibit 19** is a transcript of a portion of a consensually recorded telephone call between Hackett and Forster. During the call, Hackett and Forster discussed email and internet promotion tools to pump ASNT stock, and Hackett made reference to the deal ("a medical deal") that the tool was promoting the day of the conversation. The United States expects that Forster would testify, consistently with the above, that he has used email and internet promotion tools in connection with other deals.

C.    **Evidence Surrounding Hackett's Prior Use of Boiler Rooms on Other Deals**

The United States seeks to present evidence of Hackett's prior use of boiler rooms on deals other than ASNT. As discussed in the Initial *In Limine* Motions, this evidence

should be admitted under FRE 404(b).  Key examples of this evidence are attached as **Exhibit 20**, which consists of a number of invoices that a Boiler Room Operator sent to Hackett's Boiler Room Broker.  The broker used these invoices to seek compensation from Hackett.  The Boiler Room Broker (who pleaded guilty earlier this year in another case filed under seal in another district) is expected to testify at trial, and has identified a number of deals that he/she promoted through boiler rooms at Hackett's request.  In addition to ASNT, these include the following tickers: BMXI, CHZP, GVCL, ITMC, LBTD, ODYY, QBIO, TLNUF, and VIVK.  The Boiler Room Broker will also identified an individual (the "Boiler Room Operator") that she engaged to pump these stocks.  Hackett usually paid the Boiler Room Broker 50% of the amounts that investors identified through the Boiler Rooms invested in ASNT.

      The Boiler Room Operator (who also pleaded guilty earlier this year in another case filed under seal in another district) is also a likely Government witness at trial. He/she is expected to testify that the boiler room pumped each of the foregoing stocks; his/her boiler room did so through false and misleading statements and omissions to investors; his/her boiler room has had a consistent practice of making such false and misleading statements and omissions to investors since its inception; and based on his experience, his boiler room is very similar to all other boiler rooms of which he is aware. The Boiler Room Broker usually paid the Boiler Room Operator 35% of the amounts that investors identified through the Boiler Rooms invested in ASNT stock.

## IV

## CONCLUSION

For the reasons stated above and in prior briefing, the United States respectfully requests that this Court grant its Initial *In Limine* Motions.

DATED: October 4, 2019.

                                              Respectfully submitted,

                                              ROBERT S. BREWER, JR.
                                              United States Attorney

                                              */s/ Aaron P. Arnzen*
                                              AARON P. ARNZEN
                                              ANDREW J. GALVIN
                                              Assistant U.S. Attorneys