ROBERT S. BREWER, JR.
United States Attorney
AARON P. ARNZEN, Cal Bar No. 218272
ANDREW J. GALVIN, Cal Bar No. 261925
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-8384 / 9721
Email: Aaron.Arnzen@usdoj.gov; Andrew.Galvin@usdoj.gov

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW HACKETT (1), <br> ANNETTA BUDHU (2), <br><br> Defendants. | Case No. 18CR3072-BTM <br><br> **UNITED STATES' SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO ADMIT EVIDENCE OF DEFENDANT ANDREW HACKETT'S USE OF BOILER ROOMS TO PROMOTE "DEALS" OTHER THAN IN THE CHARGED SCHEME** |

The United States of America, by and through its counsel, Robert S. Brewer, United States Attorney, and Aaron P. Arnzen and Andrew J. Galvin, Assistant U.S. Attorneys, hereby files this second supplemental memorandum in support of its motion *in limine* to admit evidence of defendant Andrew Hackett's use of boiler rooms to promote "deals" other than in the charged scheme (the "Initial *In Limine* Motions").

## I.
## INTRODUCTION

At the October 21, 2019 *in limine* hearing, the Court directed the United States to specifically identify evidence referenced in its Initial *In Limine* Motions, as well as the related testimony the United States expects to elicit. Specifically, this second supplemental submission attaches evidence surrounding defendant Hackett's use of boiler rooms on seven other "deals,"[1] which the United States seeks to introduce under Fed. R. Evid. 404(b) (the "Uncharged Stocks"). *See* ECF No. 172 and 187. The evidence described below surrounding the Uncharged Stocks should be admitted because it shows that Hackett knew the boiler rooms misled the investors they called, and manipulated the market in coordination with Hackett through matched trades.

## II.
## THE CHARGES AND EXPECTED EVIDENCE

### A.   The Indictment

Hackett and Budhu are charged with conspiracy to commit securities fraud and a substantive count of securities fraud surrounding the stock of Arias Intel Corp (ticker symbol: ASNT). The indictment alleges that the scheme featured several moving parts.

First, as relevant here, "defendant HACKETT would engage call room operators to contact potential investors and convince them to purchase Arias stock, in exchange for a portion of the investments made by those investors." ECF No. 1, at 4:20-23. Second, Hackett "would engage in manipulative trading in Arias stock in order to artificially avoid

---

[1]   The United States' initial motion included nine ticker symbols. The United States no longer intends to introduce two of these – VIVK and ODYY.

the deflation of, maintain the price of, and inflate the share price of, Arias stock." *Id.* at 5:5-8.

**B.    Evidence of Boiler Rooms, Market Manipulation Surrounding the Charged ASNT Scheme**

   **1. Solicitation of Investors in ASNT Stock**

To prove the allegations above, the United States expects to present evidence that Hackett engaged the Boiler Room Broker, and the Boiler Room Broker in turn engaged the Boiler Room Operator, to contact potential investors and get them to invest in ASNT. Text messages between Hackett and the Boiler Room Broker corroborate this plan. *E.g.*, Ex. 21 (Aug. 3, 2017 text from Hackett to Boiler Room Broker: "Hvst it's at 2.00 I can get the whole deal they have lots of good news you think your New York guys will do it?").[2] Indeed, in recorded conversations with cooperating witness Michael Forster, Hackett identified the Boiler Room Broker, described his/her role with respect to ASNT, and later even introduced Forster to the Boiler Room Broker. The Boiler Room Operator will testify that after the Boiler Room Broker advised him/her to sell ASNT, his callers solicited investors through false and misleading representations and omissions. Text messages between Hackett and the Boiler Room Broker also show that Hackett knew that the Boiler Room Broker relied on others to actually identify potential investors, call them, and convince them to invest in ASNT. *See id.*

   **2. Manipulative Trades in ASNT Stock with Boiler Rooms Victims**

There is also evidence that Hackett, the Boiler Room Broker, and the Boiler Room Operator engaged in a sophisticated scheme to use the purchases by the Boiler Room Operators' victims to manipulate the market for ASNT stock. The Boiler Room Broker and Boiler Room Operator will testify that when the Boiler Room Operator's agents convinced a victim to buy ASNT stock, the Boiler Room Broker acted as a go-between for rapid-fire text messages through which Hackett and the Boiler Room Operator coordinated

---

[2] Arias Intel Corp. used to be known by the ticker symbol HVST, before the company changed names and ticker symbols.

the time, price, and volume of the victim's trades. This coordination allowed Hackett to put in an ASNT sell order at an agreed upon time, price, and volume, and for the Boiler Room Operator's agent to then instruct the victim to place an ASNT buy order at the same time, price and volume. *See, e.g.*, Ex. 21A (Jan. 24, 2018 text exchange between Hackett and Boiler Room Broker coordinating price of ASNT trade).

The Boiler Room Broker and Boiler Room Operator will further testify that there were two express purposes for exchanging these text messages. First, coordinated trading in this manner dramatically increased the chances that Hackett would "capture" the trade. In other words, Hackett wanted to sell ***his*** ASNT stock to the victim (instead of the victim buying from another, unaffiliated ASNT stockholder who wanted to sell his/her shares). Second, such coordination allowed Hackett, with the help of the Boiler Room Broker and Boiler Room Operator, to artificially influence the published market price of ASNT stock (*i.e.*, to increase, maintain, or avoid deflation in ASNT's published stock price). Coordinated trading in this manner is, of course, fraudulent and prohibited under the anti-fraud provisions of the federal securities laws.[3]

### 3. The Boiler Room Broker's Commission - 50% of Hackett's ASNT Proceeds

The United States also expects that the Boiler Room Broker and Boiler Room Operator will testify that there were agreements about how to divvy up the money that Hackett made when he sold his stock to one of the investor victims that was solicited by the Boiler Room Operator. Specifically, Hackett and the Boiler Room Broker agreed that, for every dollar a victim paid for ASNT stock, Hackett would pay $0.50 to the Boiler Room Broker. *See* Ex. 22 (Aug. 31, 2017 text exchange with Hackett – Boiler Room Broker:

---

[3]  While this type of securities trading is often charged as a variety of securities fraud under the catchall anti-fraud provision of the federal securities laws, there is a stand-alone statute that specifically prohibits such trading. Specifically, Section 9(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78(i)(a)(1)] makes it unlawful to enter trade orders if you have already coordinated the time, price, and volume of an open market trade with the counterparty on the other side of the trade.

"How many pts [percentage points] on hvst … I need min 50 on all deals[.]" Hackett: "Ok[.]") The Boiler Room Broker and Boiler Room Operator will testify that the Boiler Room Broker then paid $0.35 to the Boiler Room Operator. *See also* Ex. 23 (Oct. 17-20, 2017 invoice from Boiler Room Operator to Boiler Room Broker, requesting 35% gross commission on $9,895.10 in ASNT purchases by investor victims). An expert witness from FINRA is expected to testify that a typical commission for an equity trade in the open market is 5% or less.

The Boiler Room Operator has told the FBI that he never met Hackett, and did not know that Hackett was the person who engaged the Boiler Room Broker. Hackett has argued to the Court, and is expected to argue to the jury, that there "is not evidence that he [Hackett] saw sales pitches or had any actual knowledge of the misrepresentations allegedly made" by the Boiler Room Operator. ECF No. 182, at 7:3-7.

C. **Evidence of Boiler Rooms, Market Manipulation Surrounding the Uncharged Stocks**

The United States has moved to allow evidence that Hackett engaged the Boiler Room Broker, and the Boiler Room Broker engaged the Boiler Room Operator, to solicit investors for seven deals surrounding the Uncharged Stocks. These deals involve companies with the following ticker symbols: BMXI, CHZP, GVCL, ITMC, LBTD, QBIO, and TLNUF. This evidence should be admitted under Fed. R. Evid. 404(b) because it proves that Hackett knew the Boiler Room Broker and Boiler Room Operator defrauded ASNT investors.

1. **Solicitation of Investors in the Uncharged Stocks**

The Boiler Room Operator and Boiler Room Broker are expected to testify that, just like the ASNT scheme, Hackett engaged the Boiler Room Broker, and the Boiler Room Broker in turn engaged the Boiler Room Operator, to contact potential investors and get them to invest in the Uncharged Stocks. The Boiler Room Operator then solicited investors in each of the Uncharged Stocks by means of false and misleading representations and omissions.

More specifically, the Boiler Room Broker is expected to testify that Hackett paid him/her to engage boiler rooms for each of the Uncharged Stocks. The Boiler Room Operator is expected to testify that he/she was engaged by the Boiler Room Broker to sell each of the Uncharged Stocks.

### 2. Manipulative Trades in the Uncharged Stocks with Boiler Room Victims

Hackett, the Boiler Room Broker, and the Boiler Room Operator also engaged in the same manipulative trading scheme for the Uncharged Stocks that they employed on ASNT. Just like ASNT, when the Boiler Room Operator convinced a victim to buy stock, the Boiler Room Operator, Boiler Room Broker, and Hackett repeatedly texted each other for the purpose of coordinating the time, price, and volume of the victim's trades. The goals were the same, too – to increase the chances that Hackett would capture the trade, and to artificially inflate, maintain, or mitigate deflation in the price of the Uncharged Stocks.

### 3. The Boiler Room Broker's Commission - 50% of Hackett's Proceeds on the Uncharged Stocks

The same arrangement about divvying up proceeds was in place for the Uncharged Stocks. The Boiler Room Broker and the Boiler Room Operator are expected to testify that Hackett would pay the Boiler Room Broker 50% of the amount of purchases of the Uncharged Stocks that were made by the Boiler Room Operator's victims, and the Boiler Room Broker would, in turn, pay the Boiler Room Operator 30-35% of this amount.

\* \* \*

Additional evidence proving that Hackett used the Boiler Room Broker and Boiler Room Operator to sell, and manipulate, the Uncharged Stocks includes the following:

**BMXI** – The United States will present one or more invoices sent by the Boiler Room Operator to the Boiler Room Broker regarding sales of BMXI to victim investors. *See* Ex. 24 (Aug. 7-11, 2017 invoice seeking 30% of $150,729.53 in investor purchases of BMXI). Evidence will also include text messages from Hackett to the Boiler Room Broker, and from the Boiler Room Broker to the Boiler Room Operator, regarding BMXI. *E.g.*, Ex. 25 (Aug. 4, 2017 text exchange with Boiler Room Broker – Hackett: "Everyone I wrote

Bmxi filled your orders came in but sometimes I was saying .047 but I had my order at .046 just to make sure I capture everything you bring[.]"); Ex. 26 (July 14, 2017 text exchange between Boiler Room Broker and Boiler Room Operator coordinating price and volumes for BMXI trades); Ex. 27 (July 28, 2017 text exchange between Hackett and Boiler Room Broker coordinating price and volumes for BMXI trades).

**CHZP** – The United States will present one or more invoices sent by the Boiler Room Operator to the Boiler Room Broker regarding sales of CHZP to victim investors. *See* Ex. 28 (May 27 – June 2, 2016 invoice seeking 30% of $27,922.61 in investor purchases of CHZP). Evidence will also include text messages from Hackett to the Boiler Room Broker regarding CHZP. *E.g.*, Ex. 29 (Dec. 30, 2016 text exchange between Hackett and Boiler Room Broker discussing Hackett's promise to pay for victim purchases of CHZP – Boiler Room Broker: "19k for chzp … plus this week trades … right[.]" Hackett: "I am sending 10k for chzp more is going to hit today they only sent half what they had to send me. And money for yesterday trades[.]").

**GVCL** – The United States will present one or more invoices sent by the Boiler Room Operator to the Boiler Room Broker regarding sales of GVCL to victim investors. *See* Ex. 30 (Aug. 17 – 18, 2017 invoice seeking 35% of $136,765.48 in investor purchases of GVCL). Evidence will also include text messages from Hackett to the Boiler Room Broker, and from the Boiler Room Broker to the Boiler Room Operator, regarding GVCL. *E.g.*, Ex. 31 (Aug. 17, 2017 text exchange between Hackett and Boiler Room Broker coordinating price and volumes for GVCL trades); Ex. 32 (Aug. 17, 2017 text exchange between Boiler Room Broker and Boiler Room Operator coordinating price and volumes for GVCL trades).

**ITMC** – The United States will present text messages from Hackett to the Boiler Room Broker regarding ITMC. *E.g.*, Ex. 33 (Mar. 27, 2017 text exchange between Hackett and Boiler Room Broker coordinating price and volumes for ITMC trades).

**LBTD** – The United States will present one or more invoices sent by the Boiler Room Operator to the Boiler Room Broker regarding sales of LBTD to victim investors.

*See* Ex. 34 (Aug. 16, 2017 invoice seeking 30% of $23,104.48 in investor purchases of LBTD). Evidence will also include text messages from Hackett to the Boiler Room Broker, and from the Boiler Room Broker to the Boiler Room Operator, regarding LBTD. *E.g.*, Ex. 35 (Aug. 16, 2017 text exchange between Boiler Room Broker and Boiler Room Operator coordinating prices and volumes for LBTD trades); Ex. 36 (Aug. 16, 2017 text exchange between Boiler Room Broker and Hackett coordinating price and volumes for LBTD trades).

**QBIO** – The United States will present one or more invoices sent by the Boiler Room Operator to the Boiler Room Broker regarding sales of QBIO to victim investors. *See* Ex. 37 (May 9 – 13, 2016 invoice seeking 30% of $25,404.44 in investor purchases of QBIO). Evidence will also include text messages from Hackett to the Boiler Room Broker regarding QBIO. *E.g.*, Ex. 38 (Jan. 4, 2017 text from Hackett to Boiler Room Broker about Hackett's plan to pay him/her, including with proceeds from sale of QBIO stock).

**TLNUF** - The United States will present text messages from Hackett to the Boiler Room Broker regarding TLNUF. *E.g.*, Ex. 39 (Jan. 26, 2017 text between Hackett and Boiler Room Broker coordinating price of TLNUF stock).

### III.
### ARGUMENT

Evidence surrounding Hackett's use of the Boiler Room Broker and Boiler Room Operator to pump and dump the Uncharged Stocks should be admitted under Rule 404(b).

First, the evidence is relevant. The United States expects Hackett to argue that he is not guilty because, *inter alia*, he lacked the requisite *mens rea*. For example, we expect the evidence to show that Hackett only communicated with the Boiler Room Broker, and not with the Boiler Room Operator. This would allow Hackett to argue that he had no idea that the Boiler Room Operator made false and misleading statements / omissions in pushing victims to purchase ASNT stock. The United States should have the opportunity to refute this defense. *See United States v. Curtin*, 489 F.3d 935, 940

(9th Cir. 2007) ("Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense.").

To do so, the United States would present the evidence described above and in its previous briefing on the issue. The United States would argue that, given the number of times Hackett used the Boiler Room Broker, Hackett was in an excellent position to know that the Boiler Room Operator defrauded investors when he/she pumped ASNT on behalf of Hackett. Most importantly, *Hackett worked directly with the Boiler Room Broker to manipulate the market for ASNT and the Uncharged Stocks (and thereby committed securities fraud) when he exchanged text messages with the Boiler Room Broker to coordinate the time, price and volume of the ASNT trades directly.* See Ex. 21A, 25, 26, 27, 31, 32, 33, 35, 36. In addition, standard commissions in the securities brokerage industry rarely exceed 5% – the only plausible explanation for paying the Boiler Room Broker 50% (ten times a standard commission) of Hackett's proceeds from selling ASNT stock is that Hackett knew the boiler rooms were engaged in fraud. Simply put, Hackett's repeated use of boiler rooms for other deals is highly relevant to his knowledge and intent in pumping ASNT stock.

Second, the boiler room promotions of the Uncharged Stocks were not too remote in time. In fact, Hackett paid the Boiler Room Operator to pump BMXI, CHZP, GVCL, ITMC, LBTD, QBIO, and TLNUF in 2016, 2017, and/or 2018. And Hackett paid for ASNT to be pumped through the Boiler Room Broker in 2017 and 2018. His use of the boiler rooms on the Uncharged Stocks is therefore not too remote in time. *United States v. Lozano*, 623 F.3d 1055, 1059-60 (9th Cir. 2010) (three years not too remote).

Third, the evidence is certainly sufficient to show that Hackett paid boiler rooms to pump the Uncharged Stocks. The Boiler Room Broker will testify that Hackett paid him/her to do so, and the Boiler Room Operator will testify that the Boiler Room Broker did the same. In addition, the Boiler Room Operator contemporaneously emailed periodic invoices to the Boiler Room Broker detailing the amounts that he "earned" by pumping the Uncharged Stocks. The United States intends to introduce these invoices

9

18CR3072-BTM

at trial to corroborate the expected testimony described above. *See, e.g.*, Ex. 23, 24, 28, 30, 34, 37.

Fourth, Hackett's use of boiler rooms to pump the Uncharged Stocks is virtually identical to his use of the rooms to pump ASNT. The Boiler Room Operator is expected to testify that his methods did not change over time or from one stock introduced by the Boiler Room Broker to the next.

Finally, the evidence should not be excluded under Rule 403. The evidence is highly relevant to Defendants' intent and knowledge of the boiler rooms that pumped and dumped ASNT stock. And any prejudice would be insufficient to meet Rule 403's "unfair" standard. The evidence is not voluminous and would not take an undue amount of time to present, the impact of using boiler rooms to pump other stock is unlikely to prompt an emotional response in the jurors, and a limiting instruction during and at the conclusion of the trial would be sufficient to ensure the jury considers it for only prescribed purposes. *See United States v. DeDinces*, 808 F.3d 785, 791-92 (9th Cir. 2015).

## IV
## CONCLUSION

For the reasons stated above and in prior briefing, the United States respectfully requests that this Court grant its Initial *In Limine* Motions.

DATED: October 25, 2019.

    Respectfully submitted,

    ROBERT S. BREWER, JR.
    United States Attorney

    */s/ Aaron P. Arnzen*
    AARON P. ARNZEN
    ANDREW J. GALVIN
    Assistant U.S. Attorneys